RECEIPT #
AMO_
UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

FILED
IN CLERKS OFFICE

2005 FEB 18  P 3: 39

U.S. DISTRICT COURT
OF MASS.

NORTH AMERICAN SPECIALTY
INSURANCE COMPANY,

Plaintiff,

v.

J & K FISHING CORP.,

Defendant,

)
)
)
)
)
)
)
)
)
)

CIVIL ACTION NO.

**05c 10336 RWZ**

## COMPLAINT FOR DECLARATORY JUDGMENT
## PURSUANT TO 28 U.S.C. §§ 2201 ET SEQ. AND FED. R. CIV. P. 57

### Introduction and Jurisdictional Allegations

Plaintiff, North American Specialty Insurance Company, by undersigned counsel, as and

for its Complaint for Declaratory Judgment Pursuant to 28 U.S.C. §§ 2201 et seq. and Fed. R.

Civ. P. 57 against defendant, J & K Fishing Corp., states upon information and belief, as follows:

1.      Plaintiff, North American Specialty Insurance Company (the "Underwriters"), is a

corporation organized and existing under the laws of the State of New Hampshire, with a

principal place of business in Manchester, New Hampshire.

2.      Upon information and belief, defendant, J & K Fishing Corp. (the "Assured"), is a

corporation organized and existing under the laws of the Commonwealth of Massachusetts, with

a principal place of business in Yarmouth, Massachusetts.

3.      This is an action for a declaratory judgment pursuant to 28 U.S.C. §§ 2201 et seq. in

connection with a certain marine insurance policy, no. DMM0000108-01 (the "Policy"), issued

by the Underwriters to the Assured providing various types of insurance coverage in connection

with the fishing vessel F/V ATLANTA (the "ATLANTA" or the "vessel"), on express and

implied warranties, terms and conditions, including specifically hull and machinery insurance in the amount of $800,000 and mortgagee's interest insurance in the amount of $598,000. A copy of the Policy is attached hereto as Exhibit A.

4.    There is more than $75,000 in controversy herein, and this Court has jurisdiction over this matter under both 28 U.S.C. §§ 1332 and 1333.

5.    This is an admiralty and maritime action within the meaning of Fed. R. Civ. P. 9(h).

6.    Pursuant to Fed. R. Civ. P. 57, the Underwriters request a speedy hearing in connection with this matter.

## Factual Allegations Common to All Counts

7.    The Assured is or was the owner of the F/V ATLANTA, a 71 foot steel-hulled fishing vessel built in 2002 which bore Vessel Identification Number 1123523 and which, as detailed further below, sank approximately 25 nautical miles south of Chatham, Massachusetts on December 13, 2003, with the loss of three crew members.

8.    The Assured has or had two equal shareholders, Mr. Jorge Carvalho and Mr. Kenneth Silva.

9.    The Assured contracted with St. Charles Shipyard of Thibodaux, Louisiana for the construction of the vessel pursuant to a contract dated December 12, 2001.

10.    After the construction of the vessel's hull was completed on or about July 8, 2002, the Assured retained a Louisiana naval architect, Mr. Peter Fritz, to perform an inclining test on the vessel, a test which is used in connection with determining a vessel's stability.

11.    Mr. Fritz performed an inclining test on the ATLANTA on behalf of the Assured on or about December 23, 2002.

2

12.    Mr. Fritz issued an Inclining Report in connection with the inclining test on or about January 3, 2003, in which he noted that the vessel was "tender" which means, in nautical parlance, that the vessel was top heavy, which it turn means that the vessel could easily roll over. Mr. Fritz's Inclining Report is attached hereto as Exhibit B.

13.    Mr. Fritz stated in his Inclining Report that "[i]n order to determine how much fixed ballast should be added to the vessel, to improve the top-heavy nature of this vessel, further stability calculations have to be done."   Exhibit B.

14.    Mr. Fritz concluded in his Inclining Report that: "[b]ased on the inclined condition, we recommend calculating tank capacity tables and with these determine the different operating conditions and the resulting stability.  This will determine how much additional weight should be added to this vessel to improve its marginal stability."   *Id.*

15.    The Assured never undertook the steps naval architect Fritz recommended, including calculating tank capacity tables to determine the different vessel operating conditions and the resulting stability to study and correct the vessel's marginal stability.

16.    The Assured never consulted with any naval architect, marine engineer or other professional qualified to make stability calculations for the vessel, other than Mr. Fritz, in connection with the ATLANTA's stability.

17.    Though the Assured did add certain ballast to the vessel, it did not do with the advice of a naval architect, marine engineer or other professional qualified to make stability calculations for the vessel to determine exactly how much additional ballast was necessary to correct the vessel's marginal stability or exactly where on board the vessel the additional ballast needed to be placed.

18.    On information and belief, during a fishing voyage in June, 2003, the ATLANTA nearly capsized.

3

19.    On information and belief, after the June, 2003 fishing voyage during which the

ATLANTA nearly capsized, the Assured added still further ballast but, again, without the advice

of a naval architect, marine engineer or other professional qualified to make stability calculations

for the vessel.

20.    Defendant, J & K Fishing Corp., provided no instruction or training whatsoever to the

ATLANTA's crew regarding maintaining vessel stability, instead, depending on the untrained

captain assigned to the vessel for any given fishing trip to maintain vessel stability.

## The Insurance Policy

21.    The Underwriters issued the Policy to the Assured in respect of the ATLANTA to cover

the period from December 2, 2002 to December 3, 2003, and, at the Assured's request, the

Underwriters later renewed the Policy to include the period from December 3, 2003 to December

3, 2004.

22.    On information and belief, in applying for the insurance coverage provided in the Policy,

the Assured provided certain information to its insurance broker, which prepared a form

captioned "Smithwick & Mariners Insurance, Inc. Fishing Vessel Application" based on the

information the Assured provided.

23.    One of the questions set forth in the Smithwick & Mariners Insurance, Inc. Fishing

Vessel Application asked whether the vessel had been stability tested, and when asked that

question the Assured indicated the vessel had not been stability tested.

24.    After naval architect Fritz had performed his inclining test and generated his Inclining

Report, a test used in connection with determining a vessel's stability, the Assured never advised

its insurance broker or the Underwriters that the inclining test had occurred or that the vessel had

4

failed the test, and never provided a copy of Mr. Fritz's Inclining Report to its insurance broker or to the Underwriters.

25.     The Policy provided defendant with four types of marine insurance coverage, on express and implied warranties, terms and conditions.  These coverages included: hull and machinery insurance, mortgagee's interest insurance, protection and indemnity insurance, and war risks insurance.

26.     Under the terms of the Policy, and pursuant to the general maritime law of the United States, the Assured warranted to the Underwriters that the F/V ATLANTA was seaworthy.

27.     Under the terms of the Policy, the Assured agreed to cooperate with the Underwriters in connection with the investigation of claims.

28.     A Rider page to the Policy provides:

> "It is agreed that the following clauses supersede any conflicting conditions found in any of the attached polices, clauses or endorsements.
>
> CLAIMS COOPERATION:  The Assured shall render every assistance to facilitate investigation or adjustment of claims or the effecting of settlements and to co-operate fully in the securing of evidence, the attendance of witnesses and the eliciting of information in defending such claims, including the prosecuting of appeals, it being understood that failure to comply fully with the terms of this paragraph shall render the policy null and void and that, in the event, no further obligation of any character shall rest upon the company.

29.     The hull and machinery portion of the Policy provides that "[i]t is a condition of this policy that no suit, action or proceeding for the recovery of any claim for physical loss of or damage to the vessel named herein shall be maintainable in any court of law or equity unless the same be commenced within twelve (12) months next after the calendar date of the happening of the physical loss or damage out of which the said claim arose."

30.    The mortgagee's interest insurance provides coverage in favor of the Assured's mortgagee, First Pioneer Farm Credit, on certain terms and conditions, if the Underwriters do not pay on a claim made under the hull and machinery portion of the Policy.  Under the mortgagee's interest portion of the Policy, the "Assured" is defined to be the mortgagee, First Pioneer Farm Credit.  In clause 2 of the mortgagee's interest portion of the Policy, it is stated that the mortgagee's interest insurance:

> insures only against the non-payment by underwriters of the Hull Policy, of a claim asserted thereunder for any liability, loss, damage or expense occurring or arising during the term of this Policy, which non-payment results from any act of, or omission by, the assured(s) named in the Hull Policy, or breach any warranty, express or implied, in the Hull Policy other than breach of the warranty contained in the F.C. & S. Clause[1] thereof: PROVIDED that such act or omission or breach of warranty occurred without the consent or privity of the Assured.

31.    Under clause 5 of the mortgagee's interest insurance, if the Underwriters pay the mortgagee, the Underwriters become subrogated to all of the mortgagee's rights under the hull and machinery portion of the Policy and to all of the mortgagee's rights under the Mortgage on the Vessel, any note or bond secured thereby, and any other instrument taken by the [mortgagee] as security for repayment of the mortgage indebtedness.

### The ATLANTA's Operating History

32.    The F/V ATLANTA completed approximately nine fishing trips, all in 2003, before capsizing and sinking with the loss of three crewmen on December 13, 2003.

33.    On December 13, 2003, at approximately 2230 hours, the ATLANTA was engaged in a scallop fishing voyage approximately 25 nautical miles south of Chatham, Massachusetts.

34.    On December 13, 2003, the 71 foot vessel's hold was loaded with approximately 9,000 pounds of scallop meat.

---

[1] The "F.C. & S. Clause" referred to is the Free of Capture and Seizure Clause, relating to the physical taking of the vessel, and is not here at issue.

35.    On December 13, 2003, there was a very large mound of unshucked scallops on deck, piled seven to ten feet high, sufficiently high so that a man could walk on the pile up on to the ATLANTA's wheelhouse deck.

36.    The ATLANTA had a port list (that is, it tilted to the port or left side) in either a loaded or unloaded condition.

37.    On December 13, 2003, the ATLANTA had filled the freshwater tank in the vessel's stern in an effort to correct the port list.

38.    At approximately 2200 hours (10:00 p.m.) on the night of December 13, 2003, the ATLANTA was fishing in 3 to 4 foot seas with winds of approximately 15 knots from the north.

39.    The weather conditions on December 13, 2003 in the area where the ATLANTA was fishing were not abnormal or unusual.

40.    At approximately 2230 hours (10:30 p.m.) on the night of December 13, 2003, the captain for this fishing trip, Mr. Pereia, brought both loaded scallop dredges alongside the vessel, raised the starboard (or right) side dredge, which weighed some 3,500 pounds in a loaded condition, and placed the loaded starboard side dredge on top of the pile of scallops on the starboard side of the vessel's deck.

41.    Mr. Pereia next began to lift the loaded port (or left) side dredge out of the water.

42.    Once the loaded port side dredge was raised, the ATLANTA began to list to port, or, in other words, began to roll to its port side, causing the large mound of unshucked scallops on deck to also shift to the port side, and the vessel then capsized to port.

43.    Shortly after the vessel capsized to port, the vessel sank.

## COUNT I – THE ASSURED BREACHED
## IMPLIED WARRANTIES OF SEAWORTHINESS

44.    Plaintiff Underwriters repeat the allegations set forth in paragraphs 1 through 43.

7

45.    Under the general maritime law, a vessel is unseaworthy if it is not reasonably fit for its intended service. *Ferrara v. A & V Fishing, Inc.*, 99 F.3d 449 (1st Cir. 1996).

46.    Under the general maritime law, a vessel is unseaworthy if its crew is incompetent to perform the duties it may be called on to perform, including any exigency that may be encountered. *Acadia Insurance Co. v. Allied Marine Transport LLC*, 151 F. Supp.2d 107, 118-22 (D. Me. 2001).

47.    Under the general maritime law, there are two implied warranties of seaworthiness in a time hull and machinery marine insurance policy. *Continental Insurance Co. v. Lone Eagle Shipping Ltd.*, 952 F. Supp. 1056, 1066-68 (S.D.N.Y. 1997), *aff'd per curiam*, 134 F.3d 103 (2d Cir. 1998); *Saskatchewan Government Insurance Office v. Spot Pack, Inc.*, 242 F.2d 385, 389 (5th Cir. 1957). The first warranty is an absolute warranty that the vessel is in fact seaworthy when the policy attaches. 952 F. Supp. at 1068. The second warranty is a negative implied warranty that the vessel owner will not knowingly send the vessel to sea in an unseaworthy condition. *Id.*

48.    Under the general maritime law, the doctrine of *uberrimae fidei* "imposes a strict duty on the assured to disclose to the insurer all known circumstances that materially affect the insurer's risk, the default of which renders the insurance voidable by the insurer." *Windsor Mount Joy Mutual Insurance Co. v. Giragosian*, 57 F.3d 50, 55-56 (1st Cir. 1995). "Once policy coverage has commenced, the doctrine imposes an equally strict, continuing obligation on the vessel owner to ensure that the vessel will not, through either bad faith or neglect, *knowingly* be permitted to break ground in an unseaworthy condition." *Id.* at 56 (emphasis in original).

49.    "If a boat sinks in calm seas, without more, the sinking is ordinarily presumed to have been caused, not by a 'peril of the sea,' but by the vessel's own inherent unseaworthiness, i.e.,

from the defective, deteriorated or decayed condition of the vessel or from ordinary wear and tear." *Pace v. Insurance Company of North America, Inc.*, 838 F.2d 572, 577 (1st Cir. 1988)(citation omitted).

50.     The ATLANTA capsized and sank in normal weather conditions and must be presumed unseaworthy.

51.     Upon information and belief, the ATLANTA was unseaworthy both when the Policy commenced in December, 2002 and when she broke ground to commence her final voyage in December, 2003.

52.     Upon information and belief, the ATLANTA was unseaworthy when the Policy commenced as a result of the vessel's serious but uncorrected stability problems and as a result of the insured's knowledge of the vessel's serious but uncorrected stability problems.

53.     Upon information and belief, the ATLANTA was inherently unseaworthy when she broke ground on her final voyage because her known stability problems had not been resolved. The vessel was further unseaworthy in that the crew had not been provided with any instructions or training by the Assured relating to the loading, handling, operations and/or stability of the vessel, and the crew was not competent to perform its duties, including any exigency that might be encountered.

54.     Upon information and belief, the Assured knew that the vessel's stability problems had not been resolved and the Assured knew it had not provided the crew with any instruction or training relating to the loading, handling, operations and/or stability of the vessel.

55.     The Assured's breaches of the implied warranties of seaworthiness render the Policy void or voidable.

## COUNT II – THE ASSURED HAS BREACHED
## ITS CONTRACTUAL DUTY TO COOPERATE

56.    Plaintiff Underwriters repeat the allegations set forth in paragraphs 1 through 55.

57.    Despite repeated requests, the Assured has failed and refused to cooperate with the Underwriters' investigation in connection with the sinking of the ATLANTA.

58.    Since January, 2004, the Underwriters and undersigned counsel have written to the Assured and the Assured's counsel on some eighteen occasions requesting that the Assured's representatives, Mr. Silva and Mr. Carvalho, provide statements under oath in connection with this matter.

59.    On or about October 1, 2004, Mr. Silva finally did provide a statement under oath but refused to answer any questions whatever in any way relating to the vessel's stability, asserting his Fifth Amendment privilege against compelled self-incrimination. A copy of Mr. Silva's deposition transcript is attached as Exhibit C.

60.    During his statement under oath, Mr. Silva, through counsel, stated that he would refuse to answer any question containing the word stability, relating to ballast or the vessel's tank capacities, asserting his Fifth Amendment privilege against compelled self-incrimination. *Id.* at page 36, lines 13 - 22; page 39, lines 3 - 8; page 58, lines 3 - 10; page 77, lines 4 -15; page 87, lines 3 - 8.

61.    During his statement under oath Mr. Silva, through counsel, refused to answer whether he ever met naval architect Peter Fritz, asserting his Fifth Amendment privilege against compelled self-incrimination. *Id.* at page 31, lines 3 -14.

62.    During his statement under oath Mr. Silva, through counsel, refused to answer whether any questions concerning the Inclining Report prepared by naval architect Peter Fritz, asserting

his Fifth Amendment privilege against compelled self-incrimination. *Id.* at page 31, lines 19 - 24 through page 32, line 8; pages 87 - 88.

63.     During his statement under oath, Mr. Silva admitted that naval architect Peter Fritz was paid in connection with the ATLANTA but refused to state how much Mr. Fritz was paid, asserting his Fifth Amendment privilege against compelled self-incrimination. *Id.* at page 35, lines 8 - 14.

64.     During his statement under oath Mr. Silva, through counsel, refused to answer whether any instructions were ever given to the master or crew of the ATLANTA concerning the vessel's stability, or indeed whether any sort of written instructions were ever provided to the ATLANTA's crews by anyone, asserting his Fifth Amendment privilege against compelled self-incrimination. *Id.* at pages 62, lines 23-24 through page 63, line 5.

65.     In total, Mr. Silva asserted his Fifth Amendment privilege against compelled self-incrimination approximately 25 times. *Id.* at pp. 28 – 32, 33 – 39, 58, 60, 62 – 63, 65, 74 – 77, 85 – 88.

66.     During his statement under oath, Mr. Silva testified that he had no experience at all operating the vessel at sea but that his co-shareholder, Mr. Carvalho had captained the vessel during fishing operations at sea. *Id.* at page 45, lines 4 - 9, 23 - 24, page 46, lines 1 & 18.

67.     Since January, 2004, the Underwriters have repeatedly requested that Mr. Carvalho provide a statement under oath.

68.     Though the Assured's counsel initially agreed to produce Mr. Carvalho to provide a statement under oath, and though Mr. Carvalho was interviewed by United States Coast Guard investigators in connection with the sinking of the ATLANTA, Mr. Carvalho has refused to

provide a statement under oath in connection with the Underwriters' investigation into the casualty.

69.    The Assured's counsel has represented to undersigned counsel that Mr. Carvalho is under the care of a psychiatrist, and that his ability to be deposed or questioned is "compromised" due to his emotional state.

70.    Though the Underwriters, through undersigned counsel, have for the past six months repeatedly written to the Assured's counsel asking that Mr. Carvalho's treating physician provide a letter stating his or her opinion as to whether or not Mr. Carvalho is medically able to provide a statement under oath, and if not, when he may be able do so, to date no such opinion has been received.

71.    The Assured's Mr. Silva's refusal to answer questions concerning vessel stability, even on Fifth Amendment grounds, constitutes a failure to cooperate under the terms of the Policy. *Mello v. Hingham Mutual Fire Insurance Co.*, 421 Mass. 333, 656 N.E.2d 1247 (1995); *Metlife Auto & Home*, 59 Mass. App. Ct. 583, 797 N.E.2d 18 (Mass. App. 2003).

72.    Though the Assured's counsel had previously indicated that Mr. Silva would refuse to answer any questions relating to the ATLANTA's stability until the statute of limitations applicable to 18 U.S.C. § 1115 had expired, on or about February 8, 2005, the Assured's counsel left undersigned counsel a "voice mail" message which suggested that Mr. Silva might now suddenly be amenable to further examination under oath, in which he might not assert the Fifth Amendment privilege in response to all questions relating to the vessel's stability. On February 9, 2005, undersigned counsel wrote to the Assured's counsel, yet again requesting that both Mr. Silva and Mr. Carvalho be made available to fully and unequivocally answer questions under oath. Yesterday, February 17, 2005, the undersigned received a letter from the Assured's

counsel indicating that Mr. Silva "does not need to invoke the Fifth Amendment." This does not cure the Assured's failure to cooperate with respect to Mr. Silva or otherwise. The Underwriters have already taken Mr. Silva's statement, in which he did refuse to cooperate. Further, the Assured's counsel's statement that Mr. Silva "does not need to invoke the Fifth Amendment" does not constitute the Assured's firm commitment that Mr. Silva will not invoke the Fifth Amendment, and that he will answer all questions fully and unequivocally. Moreover, because Mr. Silva has already testified that he had no personal experience operating the vessel at sea, Mr. Silva's testimony as to the vessel's stability is of uncertain value. Plaintiff Underwriters reserve all of their rights in the circumstances.

73.    The Assured's Mr. Carvalho's refusal to provide a statement under oath, or, despite the Underwriters' repeated written requests over the past six months, even to produce a written statement from his physician stating a medical opinion as to whether or not Mr. Carvalho is able to provide a statement under oath, also constitutes a failure to cooperate under the terms of the Policy.

74.    The Assured's failure to cooperate pursuant to the terms of the Policy renders the Underwriters unable to fully and adequately investigate this matter, which acts to the Underwriters' prejudice and which renders the Policy void or voidable.

### COUNT III - IF PLAINTIFFS ARE REQUIRED TO PAY THE MORTGAGEE UNDER THE MORTGAGEE'S INTEREST PORTION OF THE POLICY, PLAINTIFFS ARE SUBROGATED TO ALL OF THE MORTGAGEE'S RIGHTS AGAINST THE ASSURED.

75.    Plaintiff Underwriters repeat the allegations set forth in paragraph 1 through 74.

76.    Pursuant to the mortgagee's interest insurance portion of the Policy, the Underwriters may be required to pay J & K Fishing Corp.'s mortgagee and the assured under the mortgagee's interest insurance portion of the Policy, First Pioneer Farm Credit.

13

77.     Pursuant to the terms of the mortagee's interest insurance portion of the Policy, in the

event that the Underwriters pay the Assured's mortgagee First Pioneer Farm Credit, the

Underwriters will be subrogated to all of First Pioneer Farm Credit's rights against the Assured.


        WHEREFORE, Plaintiff, North American Specialty Insurance Company, respectfully

prays that the Court enter judgment in favor of Plaintiff for the relief requested herein, to wit:

        A.      That the Assured breached implied warranties of seaworthiness, rendering the

Policy void or voidable;

        B.      That the Assured has breached its obligation to cooperate under the Policy,

rendering the Policy void or voidable;

        C.      That in the event that Plaintiff Underwriters pay the Assured's mortgagee, under

the terms of the mortgagee's interest portion of the Policy, the Assured will be subrogated to all

of the mortgagee's rights against the Assured; and,

        D.      Any such further relief as the Court deems just and equitable.


Dated: February 18, 2005                        Respectfully submitted,

                                                NORTH AMERICAN SPECIALTY
                                                INSURANCE COMPANY

                                                By its Attorneys,


                                                Bradley F. Gandrup, Jr. (BBO No. 549794)
                                                Fitzhugh, Parker & Alvaro LLP
                                                155 Federal Street, Suite 1710
                                                Boston, MA 02110-1727
                                                Tel.: (617) 695-2330


                                    14

℀JS 44  (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a)  PLAINTIFFS

NORTH AMERICAN SPECIALTY INSURANCE COMPANY

## DEFENDANTS

J & K FISHING CORP.

*IN CLERK'S OFFICE*

2005 FEB 18  P 3: 38

**(b)**  County of Residence of First Listed Plaintiff    Manchester, NH
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant    Bristol ,
(IN U.S. PLAINTIFF CASES ONLY)
NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)**  Attorney's (Firm Name, Address, and Telephone Number)

Bradley F. Gandrup, Jr., 155 Federal St., Suite 1700, Boston, MA 02110-1727 (617) 685-2330

Attorneys (If Known)

Matthew J. Dupuy, Sweeney, Stusse, Robertson & Dupuy, P.C., 25 Mid Tech Dr., West Yarmouth, MA 02673

## II. BASIS OF JURISDICTION  (Place an "X" in One Box Only)

☐ 1  U.S. Government
Plaintiff

☐ 2  U.S. Government
Defendant

☐ 3  Federal Question
(U.S. Government Not a Party)

☒ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                                    and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business in This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT  (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☒ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Med. Malpractice | ☐ 625 Drug Related Seizure | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | Liability | ☐ 365 Personal Injury - | of Property 21 USC 881 | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| & Enforcement of Judgment | Slander | ☐ 368 Asbestos Personal | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Injury Product | ☐ 650 Airline Regs. | ☐ 830 Patent | Corrupt Organizations |
| ☐ 152 Recovery of Defaulted | Liability | Liability | ☐ 660 Occupational | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| Student Loans | ☐ 340 Marine | **PERSONAL PROPERTY** | Safety/Health | | ☐ 490 Cable/Sat TV |
| (Excl. Veterans) | ☐ 345 Marine Product | ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment | Liability | ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 850 Securities/Commodities/ |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 380 Other Personal | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | Property Damage | Act | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge |
| ☐ 190 Other Contract | Product Liability | ☐ 385 Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Product Liability | ☐ 730 Labor/Mgmt.Reporting | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | | & Disclosure Act | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | **FEDERAL TAX SUITS** | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate | ☐ 790 Other Labor Litigation | ☐ 870 Taxes (U.S. Plaintiff | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | Sentence | ☐ 791 Empl. Ret. Inc. | or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ | **Habeas Corpus:** | Security Act | ☐ 871 IRS—Third Party | ☐ 895 Freedom of Information |
| ☐ 240 Torts to Land | Accommodations | ☐ 530 General | | 26 USC 7609 | Act |
| ☐ 245 Tort Product Liability | ☐ 444 Welfare | ☐ 535 Death Penalty | | | ☐ 900Appeal of Fee Determination |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | | | Under Equal Access |
| | Employment | ☐ 550 Civil Rights | | | to Justice |
| | ☐ 446 Amer. w/Disabilities - | ☐ 555 Prison Condition | | | ☐ 950 Constitutionality of |
| | Other | | | | State Statutes |
| | ☐ 440 Other Civil Rights | | | | |

## V. ORIGIN  (Place an "X" in One Box Only)

☒ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
another district
(specify)

☐ 6 Multidistrict
Litigation

☐ 7 Appeal to District
Judge from
Magistrate
Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
22 U.S.C. 2201 et seq.

Brief description of cause:
Plaintiff insurance underwriters seek declaratory judgment.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION
UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ Yes    ☒ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):

JUDGE

DOCKET NUMBER

DATE
02/18/2005

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #            AMOUNT            APPLYING IFP            JUDGE            MAG. JUDGE

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. Title of case (name of first party on each side only) NORTH AMERICAN SPECIALTY INSURANCE COMPANY v.

J & K FISHING CORP.

2. Category in which the case belongs based upon the numbered nature of suit code listed on the civil cover sheet. (See local rule 40.1(a)(1)).

[✓] I. 160, 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

[ ] II. 195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730, 740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950. *Also complete AO 120 or AO 121 for patent, trademark or copyright cases

[✓] III. 110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310, 315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371, 380, 385, 450, 891.

[ ] IV. 220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660, 690, 810, 861-865, 870, 871, 875, 900.

[ ] V. 150, 152, 153.

3. Title and number, if any, of related cases. (See local rule 40.1(g)). If more than one prior related case has been filed in this district please indicate the title and number of the first filed case in this court.

N/A

4. Has a prior action between the same parties and based on the same claim ever been filed in this court?

YES [ ]    NO [✓]

5. Does the complaint in this case question the constitutionality of an act of congress affecting the public interest? (See 28 USC §2403)

YES [ ]    NO [✓]

If so, is the U.S.A. or an officer, agent or employee of the U.S. a party?

YES [ ]    NO [ ]

6. Is this case required to be heard and determined by a district court of three judges pursuant to title 28 USC §2284?

YES [~~✓~~]    NO [✓]

7. Do all of the parties in this action, excluding governmental agencies of the united states and the Commonwealth of Massachusetts ("governmental agencies"), residing in Massachusetts reside in the same division? - (See Local Rule 40.1(d)).

YES [✓]    NO [ ]

A. If yes, in which division do all of the non-governmental parties reside?

Eastern Division [✓]    Central Division [ ]    Western Division [ ]

B. If no, in which division do the majority of the plaintiffs or the only parties, excluding governmental agencies, residing in Massachusetts reside?

Eastern Division [ ]    Central Division [ ]    Western Division [ ]

8. If filing a Notice of Removal - are there any motions pending in the state court requiring the attention of this Court? (If yes, submit a separate sheet identifying the motions)

YES [ ]    NO [ ]

(PLEASE TYPE OR PRINT)

ATTORNEY'S NAME  Bradley F. Gandrup, Jr.

ADDRESS  Fitzhugh, Parker & Alvaro LLP, 155 Federal St., Suite 1700, Boston, MA 02110-1727

TELEPHONE NO.  617 695 2330

(Coversheetlocal.wpd - 10/17/02)