UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

NORTH AMERICAN SPECIALTY )
INSURANCE COMPANY, )
                            )
            Plaintiff,      )        CIVIL ACTION NO. 05-10336 (RWZ)
                            )
v.                          )
                            )
J & K FISHING CORP.,        )
                            )
            Defendant,      )
_____ )

## AMENDED COMPLAINT FOR DECLARATORY JUDGMENT
## PURSUANT TO 28 U.S.C. §§ 2201 ET SEQ. AND FED. R. CIV. P. 57

### Introduction and Jurisdictional Allegations

Plaintiff, North American Specialty Insurance Company, by undersigned counsel, as and

for its Amended Complaint for Declaratory Judgment Pursuant to 28 U.S.C. §§ 2201 et seq. and

Fed. R. Civ. P. 57 against defendant, J & K Fishing Corp., states upon information and belief, as

follows below. Plaintiff is filing this Amended Complaint as permitted by the Court at the June

16, 2005 scheduling conference herein, and with the consent of defendant's counsel.

1.      Plaintiff, North American Specialty Insurance Company (the "Plaintiff Underwriters"), is

a corporation organized and existing under the laws of the State of New Hampshire, with a

principal place of business in Manchester, New Hampshire.

2.      Upon information and belief, defendant, J & K Fishing Corp. (the "Defendant Assured"),

is a corporation organized and existing under the laws of the Commonwealth of Massachusetts,

with a principal place of business in Yarmouth, Massachusetts, and which is or was the owner of

the F/V ATLANTA (the "ATLANTA" or the "vessel"), which capsized and sank on December

13, 2003.

3.      This is an action for a declaratory judgment pursuant to 28 U.S.C. §§ 2201 et seq. in connection with a certain marine insurance policy (the "Policy") issued by the Plaintiff Underwriters to the Defendant Assured providing various types of insurance coverage in connection with the fishing vessel F/V ATLANTA (the "ATLANTA" or the "vessel"), on express and implied warranties, terms and conditions, including specifically hull and machinery insurance and mortgagee's interest insurance. The original Policy, No. DMM0000108-00, was issued for the period from December 3, 2002 to December 3, 2003. A separate renewal Policy, No. DMM0000108-01, was later issued at the Defendant Assured's request, on the same express and implied warranties, terms and conditions as the original Policy (except for slight changes in certain terms not relevant herein)[1], for the period from December 3, 2003 to December 3, 2004. (As noted above, the ATLANTA capsized and sank on December 13, 2003). A copy of the renewal Policy, No. DMM000108-01, is attached hereto as Exhibit A.

4.      There is more than $75,000 in controversy herein, and this Court has jurisdiction over this matter under both 28 U.S.C. §§ 1332 and 1333.

5.      This is an admiralty and maritime action within the meaning of Fed. R. Civ. P. 9(h).

6.      Pursuant to Fed. R. Civ. P. 57, the Underwriters request a speedy hearing in connection with this matter.

## Factual Allegations Common to All Counts

7.      The Defendant Assured is or was the owner of the F/V ATLANTA, a 71 foot steel-hulled fishing vessel built in 2002 which bore Vessel Identification Number 1123523 and which, as

---

[1] The original Policy was changed effective June 18, 2003 to provide hull and machinery coverage in the amount of $900,000, to change the loss payee under the mortgagee's interest coverage, and to make other slight changes not here relevant. When the Policy was thereafter renewed for the period from December 3, 2003 through December 3, 2004, the amount of the hull and machinery coverage was reduced to $800,000.

2

detailed further below, sank approximately 25 nautical miles south of Chatham, Massachusetts on December 13, 2003, with the loss of three crew members.

8.      The Defendant Assured has or had two equal shareholders, Mr. Jorge Carvalho and Mr. Kenneth Silva.

9.      The Defendant Assured contracted with St. Charles Shipyard of Thibodaux, Louisiana for the construction of the vessel pursuant to a contract dated December 12, 2001.

10.     After the construction of the vessel's hull was completed on or about July 8, 2002, the Defendant Assured retained a Louisiana naval architect, Mr. Peter Fritz, to perform an inclining test on the vessel, a test which is used in connection with determining a vessel's stability.

11.     Mr. Fritz performed an inclining test on the ATLANTA on behalf of the Defendant Assured on or about December 23, 2002.

12.     Mr. Fritz issued an Inclining Report in connection with the inclining test on or about January 3, 2003, in which he noted that the vessel was "tender" which means, in nautical parlance, that the vessel was top heavy, which it turn means that the vessel could easily roll over. Mr. Fritz's Inclining Report is attached hereto as Exhibit B.

13.     Mr. Fritz stated in his Inclining Report that "[i]n order to determine how much fixed ballast should be added to the vessel, to improve the top-heavy nature of this vessel, further stability calculations have to be done."   Exhibit B.

14.     Mr. Fritz concluded in his Inclining Report that: "[b]ased on the inclined condition, we recommend calculating tank capacity tables and with these determine the different operating conditions and the resulting stability.  This will determine how much additional weight should be added to this vessel to improve its marginal stability."  *Id.*

3

15.     On information and belief, the Defendant Assured never undertook the steps naval architect Fritz recommended, including calculating tank capacity tables to determine the different vessel operating conditions and the resulting stability to study and correct the vessel's marginal stability.

16.     On information and belief, the Defendant Assured never consulted with any naval architect, marine engineer or other professional qualified to make stability calculations for the vessel, other than Mr. Fritz, in connection with the ATLANTA's stability.

17.     On information and belief, though the Defendant Assured did add certain ballast to the vessel, it did not do with the advice of a naval architect, marine engineer or other professional qualified to make stability calculations for the vessel to determine exactly how much additional ballast was necessary to correct the vessel's marginal stability or exactly where on board the vessel the additional ballast needed to be placed.

18.     On information and belief, during a fishing voyage in June, 2003, the ATLANTA nearly capsized.

19.     On information and belief, after the June, 2003 fishing voyage during which the ATLANTA nearly capsized, the Defendant Assured added still further ballast but, again, without the advice of a naval architect, marine engineer or other professional qualified to make stability calculations for the vessel.

20.     On information and belief, the Defendant Assured provided no instruction or training or wholly inadequate instruction or training to the ATLANTA's crew regarding maintaining vessel stability.

## The Insurance Policy

21.     The Plaintiff Underwriters issued the original Policy, No. DMM0000108-00, on express

and implied warranties, terms and conditions, to the Defendant Assured in respect of the

ATLANTA to cover the period from December 2, 2002 to December 3, 2003, and, at the

Defendant Assured's request, the Plaintiff Underwriters later renewed the Policy, on the same

express and implied warranties terms and conditions (except for slight changes not here

relevant), issuing a separate Policy on, No. DMM0000108-01, for the period from December 3,

2003 to December 3, 2004.  Exh. A.

22.     On information and belief, in applying for insurance coverage, the Defendant Assured

provided certain information to its insurance broker, which prepared a form captioned

"Smithwick & Mariners Insurance, Inc. Fishing Vessel Application" based on the information

the Assured provided.

23.     One of the questions set forth in the Smithwick & Mariners Insurance, Inc. Fishing

Vessel Application asked whether the vessel had been stability tested, and, on information and

belief, when asked that question the Defendant Assured indicated, through its insurance broker,

that the vessel had not been stability tested.

24.     After naval architect Fritz had performed his inclining test and generated his Inclining

Report, a test used in connection with determining a vessel's stability, the Defendant Assured

never advised its insurance broker or the Plaintiff Underwriters that the inclining test had

occurred or that the vessel had failed the test, and never provided a copy of Mr. Fritz's Inclining

Report to its insurance broker or to the Plaintiffs Underwriters.

25.     The Policy provided the Defendant Assured with four types of marine insurance

coverage, on express and implied warranties, terms and conditions.  These coverages, on express

5

and implied warranties, terms and conditions, included: hull and machinery insurance,

mortgagee's interest insurance, protection and indemnity insurance, and war risks insurance.

26.     Under the terms of the Policy, and pursuant to the general maritime law of the United

States, the Defendant Assured warranted to the Plaintiff Underwriters that the F/V ATLANTA

was seaworthy.

27.     Under the terms of the Policy, the Defendant Assured agreed to cooperate with the

Plaintiff Underwriters in connection with the investigation of claims.

28.     A Rider page to the Policy provides:

> "It is agreed that the following clauses supersede any conflicting conditions found in any
> of the attached polices, clauses or endorsements.
>
> CLAIMS COOPERATION:  The Assured shall render every assistance to facilitate
> investigation or adjustment of claims or the effecting of settlements and to co-operate
> fully in the securing of evidence, the attendance of witnesses and the eliciting of
> information in defending such claims, including the prosecuting of appeals, it being
> understood that failure to comply fully with the terms of this paragraph shall render the
> policy null and void and that, in the event, no further obligation of any character shall rest
> upon the company.

29.     The mortgagee's interest insurance provides coverage in favor of the Assured's

mortgagee, First Pioneer Farm Credit, on certain terms and conditions, if the Underwriters do not

pay on a claim made under the hull and machinery portion of the Policy.  Under the mortgagee's

interest portion of the Policy, the "Assured" is defined to be the mortgagee, First Pioneer Farm

Credit.  In clause 2 of the mortgagee's interest portion of the Policy, it is stated that the

mortgagee's interest insurance:

> insures only against the non-payment by underwriters of the Hull Policy, of a
> claim asserted thereunder for any liability, loss, damage or expense occurring or
> arising during the term of this Policy, which non-payment results from any act of,
> or omission by, the assured(s) named in the Hull Policy, or breach any warranty,
> express or implied, in the Hull Policy other than breach of the warranty contained

6

in the F.C. & S. Clause[2] thereof: PROVIDED that such act or omission or breach of warranty occurred without the consent or privity of the Assured.

30.     Under clause 5 of the mortgagee's interest insurance, if the Plaintiff Underwriters are required to pay the mortgagee, the Plaintiff Underwriters become subrogated to all of the mortgagee's rights under the hull and machinery portion of the Policy and to all of the mortgagee's rights under the mortgage on the vessel, any note or bond secured thereby, and any other instrument taken by the [mortgagee] as security for repayment of the mortgage indebtedness.

31.     Plaintiff Underwriters have not declined coverage under the hull and machinery portion of the Policy, and have advanced some $250,000 under the protection and indemnity portion of the Policy to contribute to the settlement of crewmembers' death and injury claims.

## The ATLANTA's Operating History

32.     The F/V ATLANTA completed approximately nine fishing trips, all in 2003, before capsizing and sinking with the loss of three crewmen on December 13, 2003.

33.     On December 13, 2003, at approximately 2230 hours, the ATLANTA was engaged in a scallop fishing voyage approximately 25 nautical miles south of Chatham, Massachusetts.

34.     On December 13, 2003, the 71 foot vessel's hold was loaded with approximately 9,000 pounds of scallop meat.

35.     On December 13, 2003, there was a very large mound of unshucked scallops on deck, piled seven to ten feet high, sufficiently high so that a man could walk on the pile up on to the ATLANTA's wheelhouse deck.

36.     The ATLANTA had a port list (that is, it tilted to the port or left side) in either a loaded or unloaded condition.

---

[2] The "F.C. & S. Clause" referred to is the Free of Capture and Seizure Clause, relating to the physical taking of the vessel, and is not here at issue.

7

37.   On December 13, 2003, the ATLANTA had filled the freshwater tank in the vessel's stern in an effort to correct the port list.

38.   At approximately 2200 hours (10:00 p.m.) on the night of December 13, 2003, the ATLANTA was fishing in 3 to 4 foot seas with winds of approximately 15 knots from the north.

39.   At approximately 2200 hours (10:00 p.m.) on the night of December 13, 2003, the ATLANTA, the ATLANTA was, upon information and belief, overloaded.

40.   The weather conditions on December 13, 2003 in the area where the ATLANTA was fishing were not abnormal or unusual.

41.   At approximately 2230 hours (10:30 p.m.) on the night of December 13, 2003, the captain for this fishing trip, Mr. Pereia, brought both loaded scallop dredges alongside the vessel, raised the starboard (or right) side dredge, which weighed some 3,500 pounds in a loaded condition, and placed the loaded starboard side dredge on top of the pile of scallops on the starboard side of the vessel's deck.

42.   Mr. Pereia next began to lift the loaded port (or left) side dredge out of the water.

43.   Once the loaded port side dredge was raised, the ATLANTA began to list to port, or, in other words, began to roll to its port side, causing the large mound of unshucked scallops on deck to also shift to the port side, and the vessel then capsized to port.

44.   Shortly after the vessel capsized to port, the vessel sank, with the loss of three crewmembers.

## COUNT I – THE ASSURED BREACHED
## IMPLIED WARRANTIES OF SEAWORTHINESS

45.   The Plaintiff Underwriters repeat the allegations set forth in paragraphs 1 through 44.

46.   Under the general maritime law, a vessel is unseaworthy if it is not reasonably fit for its intended service. *Underwriters at Lloyd's v. Labarca*, 260 F.3d 3 (1st Cir. 2001).

8

47.     Under the general maritime law, the warranty of seaworthiness "encompasses the

integrity of the vessel's physical structure as well as its equipment and working procedures."

*Reliance National Insurance Company (Europe) Ltd.*, 246 F.Supp.2d 126, 136 (D. Mass. 2003)

*citing Underwriters at Lloyd's v. Labarca*, 260 F.3d 3, 7 (1st Cir. 2001).

48.     Under the general maritime law, "'if a vessel is loaded so heavily that she cannot safely

sail on the voyage contracted for, she is unseaworthy.'" *Cape Fear, Inc. v. Martin*, 312 F.3d

496, 500 (1st Cir. 2002) *quoting* 2A *Benedict on Admiralty* § 6.

49.     If the owner of a shellfishing vessel retains a naval architect to perform a stability

analysis of the vessel, and then chooses to disregard its naval architect's analysis and to load

more shellfish aboard the vessel than indicated by the naval architect, the vessel may be found

unseaworthy. *Cape Fear, Inc. v. Martin*, 312 F.3d 496 (1st Cir. 2002).

50.     Under the general maritime law, a vessel is unseaworthy if its crew is incompetent to

perform the duties it may be called on to perform, including any exigency that may be

encountered. *Acadia Insurance Co. v. Allied Marine Transport LLC*, 151 F. Supp.2d 107, 118-

22 (D. Me. 2001).

*51.*     Under the general maritime law, there are two implied warranties of seaworthiness in a

time hull and machinery marine insurance policy. *Saskatchewan Government Insurance Office*

*v. Spot Pack, Inc.*, 242 F.2d 385, 389 (5th Cir. 1957); *Employers Insurance of Wausau v.*

*Occidental Petroleum Corp.*, 978 F.2d 1422, 1431-33 (5th Cir. 1993). The first warranty is an

absolute warranty that the vessel is in fact seaworthy when the policy attaches. *Id.* The second

warranty is a negative implied warranty that the vessel owner will not, through bad faith or

neglect, knowingly permit the vessel to break ground in an unseaworthy condition. *Id.*

9

52.   Under the general maritime law, "[w]hen a vessel sinks in calm waters a presumption of unseaworthiness arises," and "[i]t is for the insured to rebut the presumption by producing competent evidence from which a factfinder could determine that the vessel sank from some reason other than the alleged unseaworthy condition." *Underwriters at Lloyd's v. Labarca*, 260 F.3d 3, 8 (1st Cir. 2001).

53.   The ATLANTA capsized and sank in normal weather conditions and must be presumed unseaworthy.

54.   Upon information and belief, the ATLANTA was unseaworthy both when the original Policy commenced in December, 2002, when the renewal Policy commenced in December, 2003 and when she broke ground to commence her final voyage in December, 2003.

55.   Upon information and belief, the ATLANTA was unseaworthy when the Policy commenced as a result of the vessel's serious but uncorrected stability problems and as a result of the insured's knowledge of the vessel's serious but uncorrected stability problems.

56.   Upon information and belief, the ATLANTA was inherently unseaworthy when she broke ground on her final voyage because her stability problems had not been resolved. Upon information and belief, the vessel was further unseaworthy in that the crew had not been provided with any, or adequate, instructions or training by the Assured relating to the loading, handling, operations and/or stability of the vessel, and the crew was not competent to perform its duties, including any exigency that might be encountered. Upon information and belief, the vessel was further unseaworthy in that at the time of the capsize and sinking it was overloaded.

57.   Upon information and belief, the Assured knew or should have known that the vessel's stability problems had not been resolved, that it had not provided the crew aboard the vessel on

1of 19

its final voyage with any, or adequate, instruction or training relating to the loading, handling, operations and/or stability of the vessel, and that on its final voyage the vessel was overloaded.

58.    Upon information and belief, the unseaworthiness of the vessel caused its capsize and sinking.

59.    The Defendant Assured's breaches of the implied warranties of seaworthiness render the Policy void or voidable.

## COUNT II – THE ASSURED FAILED TO DISCLOSE CIRCUMSTANCES MATERIALLY AFFECTING THE RISK.

60.    The Plaintiff Underwriters repeat the allegations set forth in paragraphs 1 through 59.

61.    Under the general maritime law, maritime insurance policies are "traditionally contracts *uberrimae fidei* and a failure by the insured to disclose conditions affecting the risk, of which he is aware, makes the contract voidable at the insurer's option." *Grande v. St. Paul Fire & Marine Insurance Co.*, 365 F.Supp.2d 57 (D. Me. April 15, 2005) *quoting Windsor Mount Joy Mutual Insurance Co. v. Giragosian*, 57 F.3d 50, 54 (1st Cir. 1995); *Reliance National Insurance Company (Europe) Ltd v. Hanover*, 246 F.Supp.2d 126, 135 (D. Mass. 2003).

62.    The doctrine of *uberrimae fidei* imposes "a strict duty on the insured to disclose to the insurer all known circumstances that materially affect the insurer's risk, the default of which duty renders the insurance contract voidable by the insurer." *Id.*

63.    Under the doctrine of *uberrimae fidei*, the insured is obligated "'to make a specific and full disclosure of all material facts of which the insured has, or ought to have, knowledge, and all circumstances known to him or her, and unknown to the insurer, which materially affect the risk, even though no inquiry be made.'" *See id. quoting Couch on Insurance* 3d § 99:2.

64.    The Defendant Assured failed to disclose what it knew or should have known as to the ATLANTA's stability in initially applying for the original Policy.

11

65.     In the process of renewing the Policy for the period from December 3, 2003 through December 3, 2004[3], the Defendant Assured failed provide the Plaintiff Underwriters with a copy of naval architect Fritz's inclining report, failed to disclose that an inclining test had occurred, failed to disclose naval architect Fritz's findings that the vessel was "top-heavy" and of "marginal stability," failed to disclose that naval architect Fritz had recommended that tank capacity tables be prepared and further stability calculations be performed, failed to disclose that the Defendant Assured had not followed naval architect Fritz's recommendations that tank capacity tables be prepared and further stability calculations be performed, and failed to disclose that the vessel had nearly capsized during a voyage in June, 2003.

66.     The Defendant Assured thus failed to disclose circumstances which materially affected the risk, thereby inducing the Plaintiff Underwriters to issue and/or renew the Policy which but for the non-disclosure would not have been issued and/or renewed.

67.     As a result of the Assured's foregoing failures to disclose and breaches of its duty *uberrimae fidei*, the Policy is void or voidable.

## COUNT III – THE ASSURED HAS BREACHED
## ITS CONTRACTUAL DUTY TO COOPERATE.

68.     The Plaintiff Underwriters repeat the allegations set forth in paragraphs 1 through 67.

69.     Despite repeated requests, the Defendant Assured has failed and refused to cooperate with the Plaintiff Underwriters' investigation in connection with the sinking of the ATLANTA.

70.     Between January, 2004 and the filing of the original Complaint herein on February 18, 2005, the Underwriters and undersigned counsel wrote to the Defendant Assured and the Defendant Assured's counsel on some eighteen occasions requesting that the Defendant

---

[3] As noted above, the ATLANTA capsized and sank on December 13, 2003.

12

Assured's representatives, Mr. Silva and Mr. Carvalho, be examined under oath in connection with this matter.

71.     On or about October 1, 2004, Mr. Silva finally was examined under oath but refused to answer any questions relating in any way whatever to the vessel's stability, asserting his Fifth Amendment privilege against compelled self-incrimination. A copy of Mr. Silva's deposition transcript is attached as Exhibit C.

72.     During his examination under oath, Mr. Silva, through counsel, stated that he would refuse to answer any question containing the word stability, relating to ballast or the vessel's tank capacities, asserting his Fifth Amendment privilege against compelled self-incrimination. *Id*. at page 36, lines 13 - 22; page 39, lines 3 - 8; page 58, lines 3 - 10; page 77, lines 4 -15; page 87, lines 3 - 8.

73.     During his examination under oath Mr. Silva, through counsel, refused to answer whether he ever met naval architect Peter Fritz, asserting his Fifth Amendment privilege against compelled self-incrimination. *Id*. at page 31, lines 3 -14.

74.     During his examination under oath Mr. Silva, through counsel, refused to answer whether any questions concerning the Inclining Report prepared by naval architect Peter Fritz, asserting his Fifth Amendment privilege against compelled self-incrimination. *Id*. at page 31, lines 19 - 24 through page 32, line 8; pages 87 - 88.

75.     During his examination under oath, Mr. Silva admitted that naval architect Peter Fritz was paid in connection with the ATLANTA but refused to state how much Mr. Fritz was paid, asserting his Fifth Amendment privilege against compelled self-incrimination. *Id.* at page 35, lines 8 - 14.

76.     During his examination under oath Mr. Silva, through counsel, refused to answer whether

any instructions were ever given to the master or crew of the ATLANTA concerning the vessel's

stability, or indeed whether any sort of written instructions were ever provided to the

ATLANTA's crews by anyone, asserting his Fifth Amendment privilege against compelled self-

incrimination. *Id*. at pages 62, lines 23-24 through page 63, line 5.

77.     In total, Mr. Silva asserted his Fifth Amendment privilege against compelled self-

incrimination approximately 25 times. *Id*. at pp. 28 – 32, 33 – 39, 58, 60, 62 – 63, 65, 74 – 77,

85 – 88.

78.     During his examination under oath, Mr. Silva testified that he had no experience at all

operating the vessel at sea but that his co-shareholder, Mr. Carvalho had captained the vessel

during fishing operations at sea. *Id*. at page 45, lines 4 - 9, 23 - 24, page 46, lines 1 & 18.

79.     Since January, 2004, the Plaintiff Underwriters have repeatedly requested that Mr.

Carvalho submit to examination under oath.

80.     Though the Defendant Assured's counsel initially agreed to produce Mr. Carvalho for

examination under oath, and though Mr. Carvalho was in fact interviewed by United States Coast

Guard investigators in connection with the sinking of the ATLANTA, Mr. Carvalho refused to

provide a statement under oath in connection with the Underwriters' investigation into the

casualty until June 9, 2005.  On June 9, 2005, Mr. Carvalho, though counsel, agreed to appear for

deposition on July 14, 2005.

81.     Until June 9, 2005, the Defendant Assured's counsel had represented to undersigned

counsel that Mr. Carvalho was under the care of a psychiatrist, and that his ability to be deposed

or questioned was "compromised" due to his emotional state.

14

82.    Though the Plaintiff Underwriters, through undersigned counsel, had, since August,

2004, repeatedly written to the Defendant Assured's counsel asking that Mr. Carvalho's treating

physician provide a letter stating his or her opinion as to whether or not Mr. Carvalho was

medically able to submit to an examination under oath, and if not, when he would be able do so,

as of the date of the filing of the original Complaint on February 18, 2005, no such opinion had

been received.

83.    The Defendant Assured's Mr. Silva's refusal to answer questions concerning vessel

stability, even on Fifth Amendment grounds, constitutes a failure to cooperate under the terms of

the Policy. *Mello v. Hingham Mutual Fire Insurance Co.*, 421 Mass. 333, 656 N.E.2d 1247

(1995); *Metlife Auto & Home*, 59 Mass. App. Ct. 583, 797 N.E.2d 18 (Mass. App. 2003).

84.    Though the Defendant Assured's counsel had previously indicated that Mr. Silva would

refuse to answer any questions relating to the ATLANTA's stability until the statute of

limitations applicable to 18 U.S.C. § 1115 had expired, on or about February 8, 2005, the

Defendant Assured's counsel left undersigned counsel a "voice mail" message which suggested

that Mr. Silva might now suddenly be amenable to further examination under oath, in which he

might not assert the Fifth Amendment privilege in response to all questions relating to the

vessel's stability. On February 9, 2005, undersigned counsel wrote to the Assured's counsel, yet

again requesting that both Mr. Silva and Mr. Carvalho be made available to fully and

unequivocally answer questions under oath. On February 17, 2005, the undersigned received a

letter from the Assured's counsel indicating that Mr. Silva "does not need to invoke the Fifth

Amendment." This does not cure the Assured's failure to cooperate with respect to Mr. Silva or

otherwise. The Plaintiff Underwriters have already taken Mr. Silva's statement, in which he did

refuse to cooperate. Further, the Assured's counsel's statement that Mr. Silva "does not need to

15

invoke the Fifth Amendment" does not constitute the Assured's firm commitment that Mr. Silva will not invoke the Fifth Amendment, and that he will answer all questions fully and unequivocally. Moreover, because Mr. Silva has already testified that he had no personal experience operating the vessel at sea, Mr. Silva's testimony as to the vessel's stability is of uncertain value. The Plaintiff Underwriters reserve all of their rights in the circumstances.

85.     The Defendant Assured's Mr. Carvalho's refusal to provide a statement under oath, or, despite the Plaintiff Underwriters' repeated written requests since August, 2004, even to produce a written statement from his physician stating a medical opinion as to whether or not Mr. Carvalho is able to provide a statement under oath until after the original Complaint was filed, also constitutes a failure to cooperate under the terms of the Policy.

86.     Since the original Complaint herein was filed on February 18, 2005, the Defendant Assured ignored further repeated written requests by the Plaintiff Underwriters to resume the examination of Mr. Silva and commence the examination of Mr. Carvalho, including letters dated March 23, 2005, May 19, 2005 (which letter enclosed notices of deposition for both Mr. Silva and Mr. Carvalho), May 25, 2005 and May 31, 2005.

87.     Though the Defendant Assured has now, as of June 9, 2005, approximately a year and a half after being requested to do so in January, 2004, belatedly agreed to produce both Mr. Silva and Mr. Carvalho for examination under oath, this does not cure the Assured's failure to timely cooperate.

88.     The Defendant Assured's failure to cooperate pursuant to the terms of the Policy has rendered the Underwriters unable to fully, timely and adequately investigate this matter, which acts to the Plaintiff Underwriters' prejudice and which renders the Policy void or voidable.

16

**COUNT IV – IF THE COURT DETERMINES THAT THE PLAINTIFF UNDERWRITERS ARE REQUIRED TO PAY THE DEFENDANT ASSURED'S MORTGAGEE UNDER THE MORTGAGEE'S INTEREST PORTION OF THE POLICY, THE PLAINTIFF UNDERWRITERS ARE SUBROGATED TO ALL OF THE MORTGAGEE'S RIGHTS AGAINST THE DEFENDANT ASSURED AND JUDGMENT MUST BE ENTERED IN FAVOR OF THE PLAINTIFF UNDERWRITERS AND AGAINST THE DEFENDANT ASSURED FOR THE AMOUNT SO PAID.**

89.    The Plaintiff Underwriters repeat the allegations set forth in paragraphs 1 through 88.

90.    Pursuant to the mortgagee's interest insurance portion of the Policy, the Plaintiff Underwriters may be required to pay J & K Fishing Corp.'s mortgagee (the assured under the mortgagee's interest insurance portion of the Policy), First Pioneer Farm Credit.

91.    Pursuant to the terms of the mortagagee's interest insurance portion of the Policy, in the event that the Plaintiff Underwriters pay the Defendant Assured's mortgagee First Pioneer Farm Credit, the Plaintiff Underwriters will be subrogated to all of First Pioneer Farm Credit's rights against the Defendant Assured.

92.    If the Court determines that the Plaintiff Underwriters are required to pay the Defendant's Assured's mortgagee, under the mortgagee's interest portion of the Policy, judgment must be entered in favor of the Plaintiff Underwriters and against the Defendant Assured for the amount so paid, plus interest, fees and costs.


        WHEREFORE, Plaintiff, North American Specialty Insurance Company, respectfully prays that the Court enter judgment in favor of Plaintiff Underwriters for the relief requested herein, to wit:

        A.    That the F/V ATLANTA was unseaworthy when the Policy attached, was renewed and when it broke ground on its final voyage, that such unseaworthiness caused the

17

capsize and sinking of the vessel and the Defendant Assured breached implied warranties of

seaworthiness, rendering the Policy void or voidable;

      B.      That the Defendant Assured failed to disclose circumstances material to the risk,

inducing the Plaintiff Underwriters to issue and/or renew the Policy, breaching its duty

*uberrimae fidei*, rendering the Policy void or voidable;

      C.      That the Defendant Assured has breached its obligation to cooperate under the

Policy, rendering the Policy void or voidable;

      D.      That in the event that the Plaintiff Underwriters pay the Defendant Assured's

mortgagee, under the mortgagee's interest portion of the Policy, the Plaintiff Underwriters will

be subrogated to all of the mortgagee's rights against the Defendant Assured;

      E.      That judgment be entered in favor of the Plaintiff Underwriters and against the

Defendant Assured in the amount of any payment by the Plaintiff Underwriters to defendant's

mortgagee under the mortgagee's interest portion Policy, plus interest fees, and costs; and,

      F.      Any such further relief as the Court deems just and equitable.


Dated: June 22, 2005                        Respectfully submitted,

                                    NORTH AMERICAN SPECIALTY
                                    INSURANCE COMPANY

                                    By its Attorneys,

                                    Bradley F. Gandrup, Jr. (BBO No. 549794)
                                    Holbrook & Murphy
                                    150 Federal Street, 12th Fl.
                                    Boston, MA 02110
                                    Tel.: (617) 428-1151

## CERTIFICATE OF SERVICE

I hereby certify pursuant to 28 U.S.C. § 1746 that a true copy of the above document was served upon David Ansel, Esq., Ansel & Associates, 66 Long Wharf, Boston, MA 02110 by hand delivery and upon Charles M. Sabatt, Esq., Ardito, Sweeney, Stusse Robertson & Dupuy, P.C., 25 Mid Tech Drive, West Yarmouth, MA 02673, by fax (without the accompanying exhibits) and by mail (with the accompanying exhibits) on June 22, 2005.

I certify under penalty of perjury that the foregoing is true and correct.

Dated:  June 22, 2005
Boston, Massachusetts

Bradley F. Gandrup, Jr. (BBO No. 549794)