UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NORTH AMERICAN SPECIALTY )
INSURANCE COMPANY, )
)
    Plaintiff    )    Civil Action No. 05 CV 10336 (RWZ)
)
v. )
)
J & K FISHING CORP., )
)
    Defendant    )

## DEFENDANT'S ANSWER TO AMENDED COMPLAINT FOR DECLARATORY JUDGMENT AND COUNTERCLAIM

1.    Defendant is without information or knowledge sufficient to form a belief as to the truth of the averments set forth within Paragraph 1 of the Amended Complaint.

2.    Admitted

3.    Admitted

4.    The Defendant can neither admit nor deny the allegations set forth within Paragraph 4 of the Amended Complaint as the same are conclusions of law and are not allegations of fact.

5.    The Defendant can neither admit nor deny the allegations set forth within Paragraph 4 of the Amended Complaint as the same are conclusions of law and are not allegations of fact.

6.    The Defendant can neither admit nor deny the allegations set forth within Paragraph 4 of the Amended Complaint as the same are conclusions of law and are not allegations of fact.

7.    Admitted

8.    Admitted

9.  Admitted

10. The Defendant admits that after the construction of the vessel hull was completed on or about July 8, 2002 the Defendant retained a Louisiana naval architect, Mr. Peter Fritz to perform an inclining test on the vessel, but denies all of the remaining allegations set forth within Paragraph 10 of the Amended Complaint.

11. Admitted

12. The Defendant admits that Mr. Fritz issued an inclining report in connection with the inclining test on or about January 3, 2003 in which he noted that the vessel was "tender" and Defendant further admits that a copy of Mr. Fritz's inclining report is attached to the Amended Complaint as Exhibit B. However, the Defendant denies all of the remaining allegations set forth within Paragraph 12 of the Amended Complaint.

13. The Defendant admits that the quotation set forth within Paragraph 13 of the Amended Complaint is inaccurate quotation from the inclining report prepared by Mr. Fritz.

14. The Defendant denies that the language quoted from the inclining report is an accurate quotation.

15. The Defendant admits that Defendant did not calculate tank capacity tables, but denies all of the remaining allegations set forth within Paragraph 15 of the Amended Complaint.

16. Denied

17. Denied

18. Denied

19. The Defendant admits that it added further ballast, but denies all of the remaining allegations set forth within Paragraph 19 of the Amended Complaint.

20. Denied

21. Admitted

22. The Defendant is without information or knowledge sufficient to form a belief as to the truth of the averments set forth within Paragraph 22 of the Amended Complaint by reason of the fact that the Defendant is uncertain as to the nature of the actions that were taken by its insurance broker.

23.   The Defendant is without information or knowledge sufficient to form a belief as to the truth of the averments set forth within Paragraph 23 of the Amended Complaint by reason of the fact that the Defendant does not know to which of the two policies the Amended Complaint is referring in Paragraph 23.

24.   The Defendant admits that it did not inform its insurance broker or the Plaintiff underwriter that the inclining test had occurred and further admit that the Defendant did not provide a copy of Mr. Fritz's inclining report to its insurance broker or to the Plaintiff's underwriters, but denies all of the remaining allegations set forth within Paragraph 24 of the Amended Complaint.

The Defendant admits that an inclining test is used in connection with determining a vessel's stability, but deny that such a test is generally and commonly used in testing the stability of commercial fishing vessel.

25.   The Defendant cannot admit nor deny the allegations set forth with Paragraph 25 of the Amended Complaint as the same are conclusions as opposed to allegations of fact. However, the Defendant admits that the copy of the insurance policy attached to the Plaintiff's complaint is an accurate copy.

26.   Admitted

27.   Admitted

28.   The Defendant admits the allegations set forth within Paragraph 28 of the Amended Complaint, but by way of further answer the Defendant states that the provision quoted is void or unenforceable as against public policy.

29.   Admitted

30.   Admitted

31.   The Defendant admits that the Plaintiff underwriters have advanced some $250,000.00 under the protection and indemnity portion of the policy to contribute to the settlement of crew members death and injury claims, but deny the remaining allegations set forth within Paragraph 31 by reason of the fact that the commencement of this action is tantamount to a denial of coverage.

32.   Admitted

33.   Admitted

34.   Admitted

35.   The Defendant can neither admit nor deny the allegations set forth within Paragraph 35 of the Amended Complaint and calls upon the Plaintiff to prove the same.

36. Denied

37. The Defendant can neither admit nor deny the allegations set forth within Paragraph 37 of the Amended Complaint and calls upon the Plaintiff to prove the same.

38. Admitted

39. The Defendant can neither admit nor deny the allegations set forth within Paragraph 39 of the Amended Complaint and calls upon the Plaintiff to prove the same.

40. Admitted

41. The Defendant can neither admit nor deny the allegations set forth within Paragraph 41 of the Amended Complaint and calls upon the Plaintiff to prove the same.

42. The Defendant can neither admit nor deny the allegations set forth within Paragraph 42 of the Amended Complaint and calls upon the Plaintiff to prove the same.

43. The Defendant can neither admit nor deny the allegations set forth within Paragraph 43 of the Amended Complaint and calls upon the Plaintiff to prove the same.

44. The Defendant can neither admit nor deny the allegations set forth within Paragraph 44 of the Amended Complaint and calls upon the Plaintiff to prove the same.

45. By way of answer to Paragraph 45 of the Plaintiff's Amended Complaint the Defendant hereby restates and incorporates by reference its answers to Paragraphs 1 through and inclusive of 44 of the Plaintiff's Amended Complaint.

46. This is a conclusion of law as opposed to an allegation of fact and as a result the Defendant is not required to answer.

47. This is a conclusion of law as opposed to an allegation of fact and as a result the Defendant is not required to answer.

48. This is a conclusion of law as opposed to an allegation of fact and as a result the Defendant is not required to answer.

49. Denied

50. This is a conclusion of law as opposed to an allegation of fact and as a result the Defendant is not required to answer.

51. This is a conclusion of law as opposed to an allegation of fact and as a result the Defendant is not required to answer.

52. This is a conclusion of law as opposed to an allegation of fact and as a result the Defendant is not required to answer.

53. This is a conclusion of law as opposed to an allegation of fact and as a result the Defendant is not required to answer.

54. Denied

55. Denied

56. Denied

57. Denied

58. Denied

59. Denied

60. By way of answer to Paragraph 60 of the Plaintiff's Amended Complaint the Defendant hereby restates and incorporates by reference its answers to Paragraphs 1 through and inclusive of 59 thereof.

61. This is a conclusion of law as opposed to an allegation of fact and as a result the Defendant is not required to answer.

62. This is a conclusion of law as opposed to an allegation of fact and as a result the Defendant is not required to answer.

63. This is a conclusion of law as opposed to an allegation of fact and as a result the Defendant is not required to answer.

64. Denied

65. The Defendant admits that it did not provide a copy of Naval Architect Fritz's inclining report to the Plaintiff underwriters, but denies all of the remaining allegations set forth within Paragraph 65.

66. Denied

67. Denied

68. By way of answer to Paragraph 68 of the Plaintiff's Amended Complaint the Defendant hereby restates and incorporates by reference its answers to Paragraphs 1 through and inclusive of 67 thereof.

69. Denied

70. Denied

71. Admitted

72. Admitted

73. Denied

74. Admitted

75. Admitted

76. Admitted

77. Admitted

78. Admitted

79. Admitted

80. The Defendant denies the first sentence of Paragraph 80 of the Amended Complaint, but admits the last sentence of Paragraph 80 of the Amended Complaint. Moreover, the Defendant states that Mr. Carvalho was unable to provide a sworn statement under oath until on or about June 9, 2005 as he lacked the mental capacity with which to make a sworn statement under oath.

81. Admitted

82. Denied

83. Denied

84. The Defendant respectfully declines to answer Paragraph 84 by reason of the fact that Paragraph 84 violates the provisions of Rule 8 of the Federal Rules of Civil Procedure. The Defendant is contemplating the filing of a motion to strike said paragraph or other similar paragraphs of the complaint by reason of the fact that the same violate Rule 8 of the Federal Rules of Civil Procedure. Moreover, the allegations set forth within this paragraph now necessitate the naming of Plaintiff's counsel as a witness or potential witness in this action. Without waiving its objection and to the extent that an answer to Paragraph 84 is required, the Defendant hereby denies so much of Paragraph 84 as constitutes statements of fact.

85. Denied. The allegations set forth within Paragraph 85 of the Plaintiff's Amended Complaint in part constitutes a conclusion or statement of law and as such does not require a response.

86. Denied

87. Denied. By way of further answer the Defendant states that the allegations set forth within Paragraph 87 constitute a conclusion of law and as a result do not require a response from the Defendant.

88. Denied. By way of further answer the Defendant states that the allegations set forth within Paragraph 87 constitute a conclusion of law and as a result do not require a response from the Defendant.

89. By way of answer to Paragraph 89 of the Plaintiff's Amended Complaint the Defendant hereby restates and incorporates by reference its answers to Paragraphs 1 through and inclusive of 88 thereof.

90. Admitted. By way of further answer to Paragraph 90 of the Plaintiff's Amended Complaint the Defendant states that the Plaintiff is not only "maybe required to pay" but is required to pay.

91. Denied

92. Denied

Wherefore, the Defendant hereby moves this Honorable Court to deny the Plaintiff's requests for relief.

### **AFFIRMATIVE DEFENSES**

Without admitting the allegations set forth within the Plaintiff's amended complaint Defendant hereby states the following by way of affirmative defense thereto:

1) The Plaintiff's position that the Atlanta sank because it was unseaworthy is disputed and is not supported by the evidence. The Plaintiff has predicated this action upon the assumption that the vessel was in fact unseaworthy and as a consequence the filing and prosecution of this action is an unfair and deceptive act or practice by an insurance carrier designed to frustrate the Defendant's ability to receive the benefit of its contractual bargain with the insurance carrier. As a consequence the Plaintiff should be estopped from maintaining this action.

2) The Plaintiff's position that the Defendant knew of the Atlanta's unseaworthiness is disputed and is not supported by the evidence, and as a consequence the filing and prosecution of this action is an unfair and deceptive act or practice by an insurance carrier designed to frustrate the Defendant's ability to receive the benefit of its contractual bargain with the insurance carrier. As a consequence the Plaintiff should be estopped from maintaining this action.

3)   The Plaintiff asserts that this court must presume that the Atlanta was unseaworthy because it capsized and sank in normal weather conditions. However, there is no legal authority nor factual basis upon which this court can make such a presumption. Moreover, there is evidence that militates against such a presumption. Specifically, the Coast Guard investigation indicated eight "possible" contributing factors to the accident (see Exhibit B – seven pages). Additionally there is no conclusive evidence that the boat was unseaworthy. As a result, this action should be dismissed.

4)   The Plaintiff has breached the covenant of good faith and fair dealing implied within its insurance contract by demanding that one of Defendant's principals testified at depositions sought by the Plaintiff when the Plaintiff knew that the individual's physicians had advised against his appearing at such depositions. As a consequence the Plaintiff's action should be dismissed.

5)   Contrary to the Plaintiff's allegations the Defendant's principal, Jorge Carvalho will testify as soon as his doctor's permit him to appear.

6)   The Defendant has cooperated with the Plaintiff by producing one of its principals at a deposition, responding to all questions propounded except those questions that encroached upon the individual's Fifth Amendment privilege, and provided all documents that were requested by Plaintiff.

7)   To the extent that any portions of the insurance policy at issue prohibit or penalize the Defendant or its officers or shareholders from exercising their rights under the United States Constitution, said policy is void and unenforceable as against public policy.

## COUNTERCLAIM

Without admitting the allegations set forth within the Plaintiff's complaint Defendant hereby states the following by way of counterclaim thereto:

### COUNT I

1)   The Plaintiff's position taken in this action that the Atlanta was unseaworthy, that the unseaworthiness caused its sinking, and that the Defendant's principals knew of the unseaworthiness is unsubstantiated and/or has not been conclusively established.

2)   The Plaintiff has maintained this action for the purpose of avoiding its obligations under the insurance policy issued the Defendant. In fact the Plaintiff has misled this Court in Paragraph 29 of the Complaint by failing to include the very next sentence in the policy which modifies Paragraph 29: "Provided, however, that if by the laws of the state within which this policy is issued such limitation is invalid, then such claim shall be void unless such action, suit or proceeding be commenced within the shortest limit of

time permitted by the laws of such state, to be fixed herein." Mass. Gen. Law Ch. 175, §22 provides for two years.

3) The Plaintiff has continually insisted and demanded that one of the Defendant's principals testify at a deposition to be conducted by Plaintiff despite the fact that the individual had been advised by his physicians that he could not testify for reasons of his health.

4) The investigation conducted by the Coast Guard carries with it the potential for a criminal prosecution against the Defendant or its principals and as a consequence the Defendant's principals have a right to assert a fifth amendment privilege with respect to any questions propounded and to be answered under oath that may incriminate the Defendant or its principals.

5) The Defendant has cooperated fully with the Plaintiff by providing Plaintiff with all requested documents and by producing one of its principals at a deposition, and by answering all questions at the deposition except those for which the Fifth Amendment privilege was exercised.

6) The Plaintiff's assertion that the Defendant has failed to cooperate with Plaintiff is unfounded and lacks a factual basis.

7) The Plaintiff's actions were willful and knowing violations of Mass. Gen. Laws Ch. 176D.

8) By reason of the foregoing the Plaintiff is engaging in and has engaged in unfair and/or deceptive trade acts or practices in violation of Mass. Gen. Laws Ch. 176D and as a result thereof is liable to the Defendant for its damages arising therefrom.

Wherefore the Defendant moves this honorable court to determine its damages and to award said damages including treble damages together with attorney's fees to the Defendant.

## COUNT II

1-7) Paragraphs one through and inclusive of seven Count I are hereby incorporated within Count II as paragraphs one through and inclusive of seven thereof.

8) By reason of the foregoing the Plaintiff has breached the covenant of fair dealing and good faith implied within its insurance policy and as a result thereof is liable to the Defendant for Defendant's damages.

Wherefore the Defendant moves this Honorable Court to determine its damages and to award said damages together with attorney's fees to the Defendant.

## Claim of Trial By Jury

The Defendant hereby claims a trial by jury on all issues so triable.

Respectfully submitted,
J&K Fishing Corp., Defendant
By Its Attorneys,

_____
Charles M. Sabatt
BBO#436740
25 Mid Tech Drive
West Yarmouth, MA 02673
(508) 775-3433

_____
David J. Ansel, Esquire
David J. Ansel & Associates
BBO#019900
66 Long Wharf
Boston, MA 02110
(617) 367-0200

Dated: July   11  , 2005

**CERTIFICATE OF SERVICE**
I Hereby Certify That A True Copy Of The Above Document Was Served Upon The Attorney (s) of Record For Each Other Party By 1st Class Mail, Postage Prepaid/ Hand 7-11-05

# ARDITO, SWEENEY, STUSSE, ROBERTSON & DUPUY, P.C.

ATTORNEYS AT LAW
25 MID TECH DRIVE, SUITE C
WEST YARMOUTH, MASSACHUSETTS 02673

Telephone: (508) 775-3433
Facsimile: (508) 790-4778


EXHIBIT A-1

| | | |
|---|---|---|
| Edward J. Sweeney, Jr. | September 20, 2004 | Richard P. Morse, Jr. |
| Michael B. Stusse | | Betsy Newell |
| Donna M. Robertson | | Thomas P. Carpenter |
| Matthew J. Dupuy | | Kelly S. Jason |
| Charles M. Sabatt | | Herbert F. Lach, Jr. |
| | | Tracey L. Taylor |
| | | Girard C. Brisbois |

Charles J. Ardito, P.C.

Please Refer to
 File No.: G5500D


Ms. Toni Carvalho
15 Oaklawn Drive
North Dartmouth, MA  02747

Dear Ms. Carvalho:

   Enclosed please find a letter directed to Dr. Mohammed Munir for your signature and mailing.  Thank you.

Sincerely,

Matthew J. Dupuy
MJD:lcs
Enclosure

*To whom it may concern:*

*9-25-04*

*Mr. Carvalho is under my care. Mr. Carvalho's ability to be deposed or questioned in a court case is compromised due to his current emotional state.*

*Sincerely,*
*Mohammed Munir, MD*



New Bedford Health Care
226 Field Street
New Bedford, MA 02740

Matthew J. Dupuy
Attorney At Law
25 Mid Tech Drive Suite C
West Yarmouth, MA 02673

Re: Jorge Carvalho
D.O.B. 7/20/60

March 4, 2005

Dear Mr. Dupuy:

    Mr. Jorge Carvalho is currently being treated by me for Psychiatric care. He has been on several medications over the past few months. I have recently changed one of his medications for which I feel he needs to be followed closely. I do not feel that Mr. Jorge is capable at this time to undergo a deposition. Mr. Jorge requires at least a couple of months of further evaluation of the new medication, in order for me to determine if he is psychologically capable of undergoing a deposition . Please feel free to contact me if you have any further questions.

Sincerely,

Mohammed Munir, M.D.
MM/ep



## BACKROUND

The F/V ATLANTA (ON 1123523) was a 65.2 ft, 61 GT, steel hull scalloper built at the St. Charles Steel Works Company in Thibodaux, Louisiana for Mr. ▮▮▮▮▮ and Mr. ▮▮▮▮▮ owners of J&K Fishing. The vessel was completed in early January 2003 taking 11 months to build and costing over $800,000. Mr. ▮ and Mr. ▮ made numerous visits overseeing the construction and were very pleased with the overall construction and workmanship. Both men have many years of experience in the fishing industry as fishermen and owners/operators. The F/V ATLANTA was the third vessel Mr. ▮ had built since the mid 1970's by the St. Charles Steel Works. They still own and operate the F/V JULIAN, which was the second of the three vessels.

Stability testing for vessels less than 79ft is not required by federal regulations, however during construction Mr. ▮▮▮▮ hired Mr. ▮▮▮▮ a naval architect from Thibodaux, LA to conduct an inclining test to determine the vessel's stability. Testing was conducted on 23Dec02 and witnessed by Mr. ▮▮▮▮. The preliminary test results confirmed the vessel was tender (top heavy) but more information would be required. Mr. ▮ recommended further calculations be done to taking into account tank capacities and operating conditions. That information would then be used to determine how much weight they needed to add and where to put it to reduce the tenderness of the vessel. Mr. ▮▮▮▮ never followed up on completing the required information Mr. ▮ needed so no stability guidance could be rendered.

In early January before departing the shipyard Mr. ▮▮▮▮ did add 119 bags (100 lbs each) of concrete to the vessel and 2 tons of lead. ECN 1964991 #24 ▮ shows where the weights were added. The concrete was added to the front under section of the engineroom and the two tons of lead were divided up and added to the lower engineroom bilge (1 ton forward and 1 ton aft).

Once the vessel was completed Mr. ▮▮▮▮ mastered it from Thibodaux, LA to New Bedford, MA and stated he had no problems. Once in New Bedford they added two 10 ½ ft dredges and conducted sea trials in February 2003. Mr. ▮▮▮▮ stated sea trials went well with the exception of minor problems with the hydraulic power take off pump unit (PTO), which was corrected.

## FISHING VESSEL TRIP HISTORY

The F/V ATANTA completed 9 trips prior to the capsizing and sinking on December 13, 2003. Below is a list of noteworthy trips and events during the 9 trips:

08May03: According to documents provided by the owners (ECN1964991 #5 ▮) this was her maiden fishing trip voyage. On 10May03 they were boarded by the CGC VIGOROUS and issued 4 deficiencies. All were required to be corrected prior to sailing from port once they returned. Mr. ▮▮▮▮ claimed he took care of all the requirements once returning to port and prior to sailing again, but that could not be confirmed. We do know that one of the deficiencies #2 (replace expired hand flares) was still outstanding

according to a survey report conducted by Marine Safety Consultants in New Bedford, MA dated 30May03 (ECN 1964991 #22 ▇). During a voluntary dockside fishing vessel exam in July 2004 the expired flares were not part of the deficiencies noted by the inspector indicating they were taken care of. During the July exam the vessel did not receive an exam decal due to numerous other deficiencies noted. In Aug03 all were cleared (ECN 1964991 #29 ▇) and a decal issued. The issuing of a decal confirms that all deficiencies from the 10May03 boarding were cleared however those deficiencies were not properly cleared in MISLE.

25Jun03: On this trip captain ▇ mastered the vessel. At one point during the trip the dredge got hung up on a wreck and almost capsized according to statements from Mr. ▇. Mr. ▇ stated that the captain failed to properly set the winch drag thus not allowing it to slip in case of a hang up. After returning from the trip Mr. ▇ had an additional 5 tons of lead added to the vessel (total weight added to this point 19 tons). Mr. ▇ stated the additional weight was not added because of the earlier hang up but that he thought it was a good idea. When asked where he came up with the numbers for the additional weights he referenced a discussion with Mr. ▇ after the preliminary inclining. During a phone interview with Mr. ▇ he denied recommending any amount of weights to added referring the cover letter on the December 2002 inclining report as proof. However, Mr. ▇ did say that in general discussions he may have mention amounts of weights that could be needed but no firm numbers were ever given to Mr. ▇.

08Nov03: This was Captain Pereira first fishing trip was as master and Mr. ▇ first as mate, During the short trip (6 days) they ran into heavy seas and had the wheelhouse windows blown in by a wave while Mr. ▇ was at the helm. The incident was not reported because the damage did not meet the minimum reportable marine casualty threshold.

**SITUATION ON DECEMBER 13, 2004**

On the evening of Saturday13Dec03 at approximately 2145 the F/V ATLANTA was operating at Lat 41.27:30/Lon 69.24:18 with both the port and starboard dredges dragging for scallops. The vessel departed New Bedford, MA on 03Dec03 for this trip. They had just left Nantucket Island, MA after waiting for weather conditions to break on 08Dec03. Their hold was loaded with approximately 9,000 lbs of scallop meat. On deck they had a large mound of unpicked scallops up to the rail and peaking in the center approximately 7 to 10ft from the deck. By all accounts of the crew, the pile on deck was high enough so if you stood on top of it you could pull yourself on to the wheelhouse deck. There was a smaller pile of picked scallops on the stern approximately up to the rail. The Captain (Francisco Pereira) was on the bridge with the mate ▇ who was allegedly operating the dredges. Captain Pereira was off watch but monitoring weather reports and watching the final dredge loads come onboard. Mr. ▇ and Mr. ▇ were on the portside main deck, and Mr. ▇ was on the starboard side main deck cutting scallops. They were also responsible for hooking up the bags so they could be brought from the rail on to the deck. Mr. Kenneth Toolis and Mr. Stephen Viator were

below deck sleeping. Mr. ███ said he had filled the freshwater tank in the stern void earlier that evening to correct a port list and indicated this was a standard practice. The freshwater tank in the stern void was installed as freshwater supply for the not yet installed ice marker. Mr. ██, Mr. ██████ and Mr. ████ claimed that at the time of the incident that the vessel had a port list but they were not able to give me an estimate on how many degrees the list was.

Mr. ████████, who was the mate on F/V OCEAN REIGN, saw the vessel earlier that evening and stated that the deck was fully loaded, but he did not notice anything usual about how the vessel was riding or listing. The owner, Mr. ████ stated he saw the vessel at about 1800 that evening from the wheelhouse of the F/V COOL CHANGE, which he also owns and operates. He stated "it had a good load on deck".

None of the surviving crewmen interviewed indicated they had any concerns with the stability of the vessel, sea state or weather conditions prior to the incident that night; but they all confirmed they had a very large load on deck.

At the time of the incident seas were estimated to be between 3 and 4 ft with a 15 to 20 mile an hour wind from the north. According to Mr. ███████, Captain Pereira was continuously monitoring the weather, concerned that conditions were expected to deteriorate later on that evening and into the morning of 14Dec03. The plan was to get the last two loads on board and head to the beach (an area where they could get into a lee from the wind and seas and cut scallops).

The vessel was proceeding at approximately clutch speed, Mr. ████████ had just brought both dredges along side and raised the loaded starboard dredge onboard placing it on top of the unpicked pile on deck, keeping it loaded because there was no room on deck to dump the scallops. He then began lifting the port dredge on deck; all the crewmen stated the port dredge had an extremely heavy load. Once the port dredge was raised out of the water the F/V ATLANTA began to list dangerously to port causing the scallop and debris pile on deck to slide to port. Mr. ███ claims he then backed away from the dredge controls asking the Captain to take over. Mr. ████ stated the Captain panicked and mistakenly grabbed the starboard dredge controls lifting the loaded starboard dredge, causing it to swing to port further increasing the port list. At this point water to began coming over the port rails and Mr. ██████ stated he yelled over to Mr. ██ and Mr. ████ to come over to the starboard side. Mr. ██ stated that on the way over he yelled down below to Mr. Toolis and Mr. Viator telling them what as happening. On the bridge Mr. ███ claims the Captain ran over to the starboard side and popped opened the liferaft, which according to the crew opened properly. Mr. ███ stated that the Captain ran back into the wheelhouse and when the hot exhaust stack then hit the water creating a mist, he never saw the Captain again.

All indications are that the roll was not immediate, thus allowing Mr. ██ and Mr. ██████ time to move from the port to starboard side, and giving the Captain time to pop the raft before the vessel rolled over totally to port. Mr. ████ then jumped in the water and was able to grab a floating piece of debris and hung on. Mr. ████████ stated he jumped

overboard and landed inside the liferaft. Mr. ▇ and Mr. ▇ were in the water and able to swim to the raft. Based on the statements of the crew Mr. Toolis and Mr. Viator were able to get on deck (dressed only in their underwear). Mr. ▇ stated Mr. Viator was in the water near the raft asking for help but because the raft was still tied off to the boat Mr. ▇ could not get to him before he went under. Mr. ▇ then helped Mr. ▇, Mr. ▇ and Mr. ▇ get on top of the raft. Mr. ▇ stated that Mr. Toolis popped up out of the water in front of the raft and they were able to get him into the raft with them. Mr. Toolis was badly injured and extremely cold but alive at the time. They worked to cut the raft away from the F/V ATLANTA. Crewmen claimed there were two lines securing the raft to the vessel. We were not able to determine what the second line was but believe it to have been a rigging line that got caught up with the raft. Mr. ▇ used his teeth to try and chew through the painter before they located the tools provided in the raft. Once the raft was freed they fired flares that were seen by the F/V OCEAN REIGN.

On the F/V OCEAN REIGN, Captain ▇ was awakened for his 2200 hrs watch. Upon reporting to the bridge he was informed by his mate Mr. ▇ that he noticed the lights on the F/V ATLANTA had gone out. The Captain stated he had not thought about it much because he had had generator problems earlier in the day due to a fuel filter problem and lost his lights for a short time. At 2215 the F/V OCEAN REIGN saw the flares from the F/V ATLANTA was last seen and began securing the deck to assist. At 2230 the Captain recalls getting a Boatraces fax asking him to check on the F/V ATLANTA. When the F/V OCEAN REIGN came along side the raft they found all four surviving crewmembers on top of the raft and Mr. Toolis body inside the raft. Mr. ▇ had no pants on and told the mate on the F/V OCEAN REIGN he lost them trying to put them on Mr. Toolis. Mr. ▇, Mr. ▇ and Mr. ▇ were quickly taken off the raft but Mr. ▇ was in bad shape suffering from hypothermia. The Captain and mate on F/V OCEAN REIGN claimed that Mr. Toolis was face down in the water in the raft and dead. Once on board the vessel they headed to New Bedford, MA State Pier. The Captain's body was recovered later that evening and Mr. Viator was never recovered and is presumed dead.

Despite verbal and written orders from Coast Guard investigators required drug testing was not completed until five days after the incident. All crewmen were tested with the exception of Mr. ▇ who never submitted a sample. Civil penalty action is recommended against the owners and all four crewmen for failing to get the testing done.

## CONCLUSIONS

**Using interview statements and evidence collected during the course of the investigation the following were identified as <u>possible</u> contributing factors to the sinking:**

1. <u>Loading</u>: Based on interviews with the surviving crewmen and eyewitness accounts from experienced fishermen who saw the vessel operating that evening, all stated the vessel had an extremely large pile of scallops and debris on deck. When the investigators

met with the surviving crewmen on board the F/V OCEAN REIGN on the morning of December 14, 2003 Mr. ▮ stated "You want to know what happen, we were over loaded". Crewmen did indicate that they were "loading up" because of concerns about weather coming in during the next 12 hours and had planned to head to an area where they could find a lee and shuck their catch and wait out the weather. Surviving crewmen also stated that when the portside dredge was raised it had a "large load" which caused the vessel to begin to list to the portside shifting the deck cargo and increasing the port list. The vessel was not required to have a stability test so there is no guidance available to determine if it was overloaded. Without knowing how much weight was on deck it is impossible to determine how stable or unstable the vessel would have been at the time of the incident. We do know based on a phone interview with the owner of Blue Fleet Welding (builder of the dredge) that he estimated each dredge to weigh (with bags) 2,500 lbs and each dredge could hold up to 1,000 lbs of rocks and scallops on a haul. Surviving crewmen could not recall how many hauls they had on deck that evening but they did say that the deck was loaded between 7 and 10 ft high at the highest point above the main deck. Based on the crewmen's statements describing how the vessel behaved before rolling over, it appears that deck load played a role in the incident.

2. Stability: Based on interviews with the surviving crewmen they reported the vessel had a continuous portside list in either a loaded or unloaded condition. The crew claims they managed the list by:

   1. Filling the stern freshwater tanks (2)
   2. Placement of the cargo on deck and in the fish hold.
   3. Balancing fuel tank levels.

The owner Mr. ▮ denies there was a problem with stability or listing. None of the crewmen were able to articulate how severe the list was and none of the pictures of the vessel provided showed any indication of a list. It is appears that the vessel's stability was a concern based on the fact Mr. ▮ added 119 bags of cement (100 lbs each) and 2 tons of lead in the shipyard, and an additional five tons of lead in July of 2003. All weights were added without a naval architects input. Stability concerns were also addressed in the preliminary inclining done in December 2002. Because additional testing was not done the naval architect was unable to properly calculations on how much weight was needed and where it should be placed. It is important to note that fishermen adding weights to their vessels to adjust for list and trim without a naval architects input is not unusual and is considered a common practice in the industry.

3. Dredge operator error: Mr. ▮ was the only one in the wheelhouse with the Captain at the time of the incident and indicates that he (Mr. ▮) was operating the dredges at the time. According to Mr. ▮'s statement, when the portside dredge was raised and the vessel started listing to port he backed away from the controls and told the Captain to take over. Mr. ▮ stated that the Captain panicked and accidentally grabbed the starboard side dredge controller raising the loaded starboard dredge off the scallop pile allowing it to shift to the portside. This caused the vessel to further list to the portside, allowing water to come up over the portside rail.

It is also possible that the Captain may have intended to use the starboard dredge to counter the port list. The starboard dredge was still loaded at the time and he may have wanted to counteract the portside list by trying to shift the STBD dredge over the STBD side, but did not consider the fact that the loaded dredge would shift to port once he raised it off the scallop pile.

Since both men were new to their positions on the vessel, a mistake like the one Mr. ▮ described or the theory about the Captain intending to use the STBD dredge is conceivable. All we know is the surviving crewmen on deck at the time state the starboard dredge was lifted and did swing to port causing the cargo list and water to flood over the port rail.

4. <u>Drug use</u>: Required drug testing was not completed immediately after the incident by any of the crewmen despite verbal and written notification/orders by Coast Guard investigators. When Mr. Pereira's body was recovered he had two-dime bags of marijuana in the pocket of the sweat pants he was wearing. Toxicology results from the blood taken from Mr. Pereira by the Massachusetts Medical Examiners office tested negative for all known drugs with the exception of marijuana. We could not determine if Mr. Pereira was using marijuana at the time of the incident. Mr. ▮'s drug test results came back ▮ but the Medical Review Officer reported that the specimen was diluted. A retest was not ordered because the initial test was taken five days after the incident and his test results were not presented to the Coast Guard until January 15, 2004. Mr. ▮ and Mr. ▮ results were ▮. Mr. ▮ stated that drugs were onboard the vessel but he did not witness anyone using them on the vessel and never provided any drug test samples.

Based on the evidence found on Captain Pereira, his toxicology results, a statement that marijuana was onboard F/V ATLANTA by Mr. ▮, and the fact crewmen did not report immediately for drug testing as required by CG investigators indicate that drug use could have been a factor in the mishandling of the dredge controls or other deck cargo gear.

5. <u>Crew experience and knowledge of vessel</u>: While all of the crewmen on board the vessel had many years of scalloping and fishing experience, the crew itself was relatively new to the vessel; with the exception of Mr. ▮ and Mr. ▮ who both sailed numerous times prior to this trip. Mr. ▮ had been on seven previous trips, six of which were as a deckhand. He moved up to mate on the November 2003 trip and was at the helm when a wave blew in the wheelhouse windows. Captain Pereira had many years experience as a master on board the F/V JULIAN but had made only one other trip on F/V ATLANTA, according to documents provided by the owner and that was the previous trip in November when the wheelhouse windows were blown in by a wave resulting in the trip lasting only 6 days. Mr. ▮ stated that Captain Pereira had done some sailing on the F/V ATLANTA in February 2003 during their sea trials but no documentation was provided.

It is apparent that Captain Pereira and Mr. ███ lacked the necessary experience and training for the crucial positions of Captain and mate with regard to their knowledge of the operating characteristics of the F/V ATLANTA.

Records indicate that Mr. ███ had the most experience operating the vessel mastering it on seven occasions. On those occasions when Mr. ███ was not mastering the vessel experienced "problems" on board:

   a. June 25 – July 11, 2003, dredge hangs up on a wreck and rounds dangerously almost capsizing. Captain ███ was the master.
   b. November 8 – November 14, a wave blew in wheelhouse windows. Captain Pereira was on board and Mr. ███ at the helm.
   c. Sinking in December, with Captain Pereira and Mr. ███ operating the dredges.

The crew's lack of experience and knowledge of the vessel's characteristics was a factor in the incident and could explain the alleged operator error on the winch dredge controls and the loading of the vessel.

7. <u>Storage of survival suits</u>: All the surviving crewmen with the exception of Mr. ███ knew where the survival suits were stored. They all said the suits were located under a pile "stuff" which would have made them difficult to get to in an emergency situation. All crewmen also made it clear that they would not have had time to get them that evening because of how quickly the incident took place.

8. <u>Crew training</u>: All the surviving crewmen reported that they had no fire or life saving training onboard this vessel. All said they received training on other boats working for different companies. Mr. ███ stated a training film he watched while at a different company was instrumental in helping him assist the others survives that evening because he knew what equipment was in the liferaft and basically how to use it. The owners stated that all crew training was the responsibility of the Captain.